IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HARRISON FRANKLIN,

                Plaintiff,                      ORDER

v.

                                          18-cv-381-wmc

MICHAEL DITTMAN, et al.,

                Defendants.

---

In response to the parties' diverging version of events in previous submissions, the court directed defendants to provide evidentiary answers, if possible, to seven questions regarding plaintiff's access to and receipt of his insulin, carvedilol, and gabapentin.[1] (*See* dkt. #26 at 1-2.) This opinion summarizes the evidence provided by defendants and outlines the next steps following the court's telephonic scheduling conference on April 10, 2019.

## I. Blood Sugar Monitoring and Insulin

Franklin declared that after December 17, 2018, he has had trouble receiving his timely doses of insulin because he is not let out of his cell to go to the HSU in accordance with a new policy. (Dkt. #25 at ¶ 6.) Generally, he alleges that following the court's December 14, 2018 order, he "has had consistent problems with defendants

---

[1] The court also asked about the existence of video recordings showing the administration of medicine and monitoring of plaintiff's diabetes or related movements and documentation concerning plaintiff's occasional missed dose of Lantus as noted in the original Labby declaration. (Dkt. #26 at 2.) Hodge avers that "Columbia does not preserve video when an inmate leaves or enters his cell or during the administration of medicine" and that Columbia's nursing staff "does not monitor Franklin's medication as his medication is provided on [keep on person] basis." (Dkt. #32 at ¶¶ 12-13.)

refusing to give him his insulin and pain medication."[2] (*Id.* at ¶ 8.) More specifically, he identified a number of incidents in which he was denied his insulin outright, not given it in a timely manner, or not permitted to go to HSU under the new policy. (*See id.* at ¶ 10.) Accordingly, the first two questions that the court posed involved documentation showing that: (1) "plaintiff was regularly let out of his cell to go to HSU to check his blood sugar and take his insulin between December 17, 2018 and the mid-January lockdown"; and (2) "plaintiff regularly received his insulin during the lockdown in mid-January." (Dkt. #26 at 1.)

In response, defendants submitted plaintiff's January 2019 diabetic log, which includes Franklin's morning and evening blood sugar readings and units of insulin taken. (Dkt. #32-1 at 2.) Generally, this log reflects two blood sugar readings and two or three doses of insulin per day. However, this log arguably provides documentary support for some of plaintiff's concerns, either directly or by inference:

| Reported Incident | Support |
| --- | --- |
| On January 2, 2019, defendant Fabry and non-defendant Cascade refused to let Franklin out of his cell to get his insulin at 3:30 p.m. (Dkt. #25 at ¶ 10f.) | On January 2, 2019, Franklin's evening blood sugar reading was 335, even though he took the same morning doses as the day before (on which he had an evening blood sugar reading of 162). (Dkt. #32-1 at 2.) <br><br> On January 3, 2019, the log has no blood sugar reading or insulin dosage at night. |

---

[2] Franklin contends that Dr. Labby was going to "explain[] to Defendants the importance of Plaintiff receiving his medication on a regular basis" but that she "fail[ed] to do anything of substance." (Dkt. #25 at ¶ 8.)

2

|  | (*Id.*) |
|---|---|
| On January 11, 2019, defendant Fabry and non-defendant Cascade refused to let Franklin out of his cell to get his insulin at 3:30 p.m. (Dkt. #25 at ¶ 10g.) | Franklin's evening blood sugar reading was 429 on January 11; that morning his reading was 73 and he took the same morning insulin dose (50L, 8R). (Dkt. #32-1 at 2.) |
| On January 14, 2019, at around 2:30 or 3 p.m., non-defendant CO Oregon refused to discuss Franklin's insulin because she did not have time. When she returned around 7 p.m., she said she would call HSU. At 8:45, she returned with a male nurse; Oregon told Franklin that he would not get his insulin because he had failed to force her to give it to him earlier. The male nurse said the insulin had been sent to the unit in the afternoon and detailed who was supposed to get what medication when. (*Id.* at ¶ 10h.) | The log has a note "refused to give me insulin" on January 14, 2019. (Dkt. #32-1 at 2.) There is a nursing narrative note, which states:<br><br>During HS medication, offender brought to nurse's attention that he had not received his insulin. Nurse informed offender that glucometer was on unit and that custody would be passing them out, and that the nurse would review his chart to be sure it was ordered correctly. Offender began to argue with staff and become bel[l]iger[e]nt cursing at both officer and nurse. Due to volatile response, officer instructed nurse off the tier and medication was marked as refusal due to offender's behavior.<br><br>(*Id.* at 3.) |

Additionally, the log shows that Franklin received no insulin all day on January 8 and no insulin on the evenings of January 9 and 30.

On the other hand, some of plaintiff's allegations are arguably contradicted by the contemporaneous diabetic log, or at least are not supported. For instance, plaintiff alleged that on January 15, 2019, he was denied his timely afternoon insulin despite specifically asking a male nurse for it, because the nurse claimed that Franklin "cussed"

3

at him, which was considered a refusal. (*Id.* at ¶ 10i.) On January 15, the log shows that Franklin had a glucose reading of 206 and took 50 units of long-acting insulin. (Dkt. #32-1 at 2.)[3]

Moreover, the court explicitly directed Franklin to "maintain a careful, written log of his blood sugar, noting the date, time and blood sugar reading . . . each time he checks his sugar, as well as a contemporaneous written record of when receives each medication," *and to submit his log to the court at the end of February*. (Dkt. #26 at 2.) Instead of submitting a log, plaintiff provided another declaration contending that he "is still having problems getting his insulin at prescribed times," which caused his failure to take a "fasting reading in quite some time."[4] (Dkt. #36 at ¶ 6.) He further claims that CCI is still failing to take him out of his cell for his timely doses of insulin.[5] (*Id.* at ¶ 8.)

Following a second order directing him to provide his February blood sugar log (and other materials) on April 1, plaintiff submitted his blood sugar logs for February, March and the start of April. (Dkt. #39 at 1-3.) These logs generally show two blood

---

[3] Presumably addressing this mid-January 2019 incident, Franklin later contended that defendants' explanation that he was denied insulin because he cussed at an officer is "a blatant lie," which can be dispelled by the testimony of Officer Cole, adding that "defendants don't even have the correct date." (Dkt. #36 at ¶ 9; *see also* dkt. #25 at ¶ 10i.)

[4] Plaintiff also contends he could not "answer the pleadings" because defendants were "intentionally with-holding [his] stamped envelopes," which his family purchased at the end of February but only received on March 13. (Dkt. #36 at ¶ 2.)

[5] He also adds that "CCI is still giving people the wrong insulin." (*Id.* at ¶ 8.) However, Franklin is the only plaintiff before the court and, therefore, the focus of the court's inquiry.

4

sugar readings each day, with a few notable exceptions. In early February, plaintiff has no readings for four and a half days (*id.* at 3), which plaintiff explained during the telephonic scheduling conference was due to his being sick during this period. In early March, Franklin also noted that CCI "refused to send me down" in the morning, and there are two days when he did not receive any evening insulin or test his blood sugar. (*Id.* at 1.) Finally, as discussed at the telephonic scheduling conference, plaintiff noted that throughout March his morning blood sugar readings were taken *after* he already ate breakfast, challenging their usefulness. (*See id.* (noting morning readings were "[a]fter breakfast").)

At this point, plaintiff's main complaint is that he is not provided the opportunity to check his blood sugar as prescribed at 6:30 a.m., but rather is routinely allowed to check it only after breakfast around 8:30 a.m. He also complains that his afternoon reading and insulin are sporadically delayed. Defense counsel represented that her understanding was that the delays in plaintiff's receipt of insulin were caused by his behavior, not by a systemic problem. As the court noted during the telephonic scheduling conference and will be addressed in more detail below, this dispute, in particular, necessitates an evidentiary hearing on plaintiff's motion for preliminary injunction.

On the telephone, the court again directed plaintiff to record the time, in addition to the date, of his glucose readings on an ongoing basis. Based on plaintiff's representation that his accucheck machine records the date and time of reading, and

defendant's representation the Assure Prism software lacks a history download feature (*see* dkt. #22 at ¶ 10), the court directed Attorney Rakvic-Farr to provide a log of the readings from January 1, 2019, or the earliest reading saved, whichever is later.[6]

## II. A1c Reading of 8.1

Next, the court asked what information plaintiff's A1c reading of 8.1 provides. (Dkt. #26 at 1.) Dr. Labby opined that this reading "reflects moderately acceptable control," so that plaintiff's "risk of chronic complications associated with diabetes is moderate," explaining that:

> An A1c of 8.1% reflects an average blood glucose level of 185 mg/dl (in non-diabetics the average sugar level should be around 120 mg/dl or less). In general, the higher the average blood glucose level, the faster and more severe that the chronic complications of diabetes can occur. Ideal diabetic control leads to an A1c level of 7% or less. Undiagnosed or completely noncompliant diabetics can have A1cs at 12-13%.

(Dkt. #33 at ¶¶ 6-7.) An A1c reflects a person's "average blood sugar level for the past two to three months" by "measur[ing] what percentage of [the patient's] hemoglobin . . . is coated with sugar." *A1C Test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643.

While this would suggest that Franklin's diabetes is being reasonably managed by Columbia's HSU, the wide range of his actual readings would appear reason for

---

[6] Because the software apparently only retains the last 500 readings, defendants would be well served to retain an ongoing record of any earlier readings as well, whether or not Franklin has formally requested them.

concern, particularly when they seem to coincide with failed insulin deliveries. In January, Franklin's glucose readings ranged from a low of 62 to a high of 475. (Dkt. #32-1 at 2.) Throughout January, he averaged a glucose reading of approximately 137 in the mornings, and approximately 211 in the evenings. In February, his glucose readings ranged from a low of 62 to a high of 427. (Dkt. #39 at 3.) In the morning, he averaged a glucose reading of approximately 112 and approximately 228 at night. In March, his glucose ranged from a low of 70 to a high of 300. (*Id*. at 1.) In the mornings, his glucose readings averaged approximately 127 and, in the evenings, approximately 178.[7] Consistent with plaintiff's concession during the telephonic hearing that the situation has improved, overall it seems his diabetes is more recently better controlled, yet spikes in his blood sugar remain.

III. **Carvedilol**

The court further asked about documentation demonstrating that Franklin regularly received his prescribed carvedilol in November 2018, after plaintiff alleged that he had not received the medication for the entire month. (Dkt. #26 at 1; dkt. #25 at ¶ 10j.) Defendants submitted plaintiff's patient medication profile, which shows that Dr. Syed originally ordered a 37.5 mg dose of "carvidol" on October 30,

---

[7] In the record there is an earlier partial diabetic log from June and July 2018. (*See* dkt. #22-1 at 21.) At that time, his blood sugar ranged from 70 to 325. (*Id.*) Franklin's morning glucose readings averaged approximately 96 and his evening glucose averaged approximately 214. (*Id.*)

2018.[8] (Dkt. #32-1 at 1.) The medication profile specifies that Franklin was supposed to take one tablet twice a day and that the medication should be stopped on October 30, 2019. (*Id.*) The profile shows that the carvedilol was refilled as follows:

| Refill Date | 10/30/2018 | 11/5/2018 | 11/21/18 | 11/27/2018 |
|---|---|---|---|---|
| Quantity | 21 | 120 or 20[9] | 60 | 180 |
| Dose | 37.5 | 12.5 | 12.5 | 12.5 |
| Prescription Length[10] | 10.5 days | 20 days[11] | 10 days | 30 days |

(*See* dkt. #32-1 at 1.) Hodge also reports that this medication was provided to Franklin as a "Keep on Person" drug. (Dkt. #32 at ¶ 7.) The refill history indicates that he was not denied carvedilol for the month of November; rather, it would seem that he had sufficient -- if not surplus -- tablets for the entire month. However, if Hodge's reading is correct, and the November 5, 2018, refill only provided 20 tablets, then he was without any tablets for approximately ten days between November 11 and November

---

[8] Carvidol's generic name appears to be carvedilol. *See Carvidol Tablet*, TabletWise, https://www.tabletwise.com/saudiarabia/carvidol-tablet

[9] Angela Hodge reads this profile as reporting 20 tablets were ordered on November 5, 2018; however, there appears to be a "1" before the 20, suggesting 120 tablets were ordered. (Dkt. #32-1 at 1.)

[10] The court calculated how many days' worth of medication would be provided by the refill, based on the prescription of 37.5 mg twice a day. Accordingly, plaintiff would need to take three 12.5 mg tablets at a time to get a full dose, or six tablets a day. During the telephonic scheduling conference, plaintiff confirmed that he takes six pills per day

[11] If this refill only contained 20 tablets, this would only be 3.33 days, which would indicate that he did not have enough tablets because his first prescription would have been sufficient through half the day on November 8. Three days later is November 11, which is ten days before the next refill.

21, 2018.

In his most recent declaration, plaintiff claims that he was denied his carvedilol "for the month of October." (Dkt. #36 at ¶ 7.) According to earlier medication profiles, Franklin's carvedilol was refilled as follows:

| Refill Date | 7/4/2018 | 7/30/2018 | 8/8/2018 | 8/31/2018 | 9/2/2018 |
|---|---|---|---|---|---|
| Quantity | 120 | 120 | 120 | 120 | 120 |
| Dose | 37.5 | 12.5 | 12.5 | 12.5 | 12.5 |
| Prescription Length | 60 days | 20 days | 20 days | 20 days | 20 days |

(*See* dkt. #22-1 at 39.) Accordingly, after July 4, 2018, plaintiff would have had sufficient carvedilol for 140 days. Put another way, he should have had sufficient pills to last him until November 21, 2018. Franklin reported that he is now provided a 10-day supply of 60 pills at a time.

During the telephonic scheduling conference, plaintiff acknowledged that in the past month or so his receipt of carvedilol had improved. He explained that the last time he had difficulty receiving this medication was in the end of November, and he has had no problems recently. As the court explained on the call, as long as plaintiff continues to receive his carvedilol timely, the court is less inclined to investigate this at length during the evidentiary hearing, although plaintiff will be permitted to address it, and the state defendants may present evidence showing that plaintiff regularly received his carvedilol timely even before this reported improvement.

**IV.     Gabapentin**

Finally, the court asked for documentation concerning Franklin's receipt of gabapentin since December 2018.  (Dkt. #26 at 2.)  Defendants submitted the "MAR Summaries," which show when and how much gabapentin was given between December 3, 2018, and February 10, 2019.  (Dkt. #32-1 at 4-87.)

Most days, plaintiff received two or three 600 mg doses of gabapentin.  Franklin complains that on December 26, he was denied his gabapentin.  (Dkt. #25 at ¶ 10c.)  The electronic record shows that he received 600 mg at 7:05 a.m. and another 600 mg at 10:28 a.m., but a third dose was "refused" at 10:03 p.m.  (Dkt. #32-1 at 30.)  This appears to have resulted in him going almost 22 hours without gabapentin.  The document identifies other days of missed gabapentin doses, as summarized below:

| Date | Doses Received | Doses "Refused |
|---|---|---|
| 12/9/2018 | 12:34 p.m. 7:07 p.m. | 12:16 p.m. |
| 12/14/2018 | 6:37 a.m. 11:50 a.m. | 12:45 p.m. |
| 12/15/2018 | 12:14 p.m.[12] 7:21 p.m. | 7:35 a.m. 8:31 a.m. |
| 12/22/2018 | 7:09 a.m. 11:55 a.m. 8:43 p.m. | 9:21 p.m. |
| 1/8/2019 | 11:39 a.m.[13] | 7:27 a.m. |

---

[12] Because of the doses missed on December 14-15, plaintiff went nearly 24 hours without gabapentin.

[13] Before receiving a dose of gabapentin at 11:39 a.m. on January 8, 2019, Franklin's last dose was at 11:42 a.m. on January 7.

|            | 7:51 p.m.   | 8:48 p.m.   |
|------------|-------------|-------------|
| 1/10/2019  | 6:54 a.m.   | 7:31 a.m.   |
|            | 11:32 a.m.  |             |
|            | 7:28 p.m.   |             |
| 1/15/2019  | 7:22 a.m.   | 7:29 a.m.[14] |
|            |             | 12:40 p.m.  |
| 1/17/2019  | 3:28 p.m.[15] | 5:30 a.m.  |
|            |             | 10:27 p.m.[16] |
| 1/22/2019  | 7:58 a.m.   | 9:35 p.m.   |
|            | 12:13 p.m.  |             |
| 1/23/2019  | 8:50 a.m.   | 1:25 p.m.   |
|            | 8:40 pm.    |             |
| 1/24/2019  | 9:07 a.m.   | 12:27 p.m.[17] |
|            | 9:54 p.m.   |             |
| 1/27/2019  | 7:54 a.m.   | 2:47 p.m.   |
|            | 12:09 p.m.  |             |
|            | 7:23 pm.    |             |
| 1/31/2019  | 8:14 a.m.   | 8:06 p.m.   |
|            | 12:05 p.m.  |             |

Accordingly, even on days where plaintiff was marked as having "refused" his gabapentin, he still generally received *some* medication. Further, some of the refusals are negated by similarly timed medication purportedly provided.

At the telephonic scheduling hearing, plaintiff represented that he has "no complaints" presently about his gabapentin because defendants are providing it to him

---

[14] Instead of saying "refused," the annotation states "not done: late chart." (Dkt. #32-1 at 54.)

[15] Before Franklin received gabapentin at 3:28 p.m. on January 17, his last dose was at 11:15 a.m. on January 16. His next does was at 12:37 p.m. on January 18.

[16] These doses were not done because "meds accepted by inmate on lockdown." (*See* dkt. #32-1 at 58.)

[17] On January 24, there is an annotation that the medication was "Not Done: given @12:27," but this note lacks the dosage purportedly given. (*See* dkt. #32-1 at 66.)

consistent with his doctor's orders. Accordingly, the evidentiary hearing will not address plaintiff's access to gabapentin.

## V. Next Steps

As outlined above, there remain disputes of fact that may justify the entry of a preliminary injunction, at least as to plaintiff's timely blood sugar monitoring and access to insulin. Accordingly, an evidentiary hearing is necessary. The main focus of the hearing will be the necessity of permitting and the failure to permit plaintiff to check his blood sugar at 6:30 a.m., as well as the substantial fluctuation of his recorded blood sugars in the evenings, which may correspond with delayed or denied insulin. The hearing may also address whether preliminary relief is necessary regarding plaintiff's access to carvedilol.

Because of the concern that plaintiff's diabetic management is still being interfered with, the court would like to schedule an evidentiary hearing via video conference sooner rather than later. Ideally, this hearing would be held within two weeks of the telephonic scheduling conference, but also a week following receipt of plaintiff's more detailed glucose monitoring log from defendants. If defense counsel for the state defendants will require more time to produce the glucose log, she should provide a written status report within five days.

Finally, plaintiff alleges that he "is being threatened with transfer to Stanl[e]y or Jackson as punishment for his continued attempts to bring this stuff to the attention of the court." (Dkt. #36 at ¶ 10.) If that were true, the court would grant plaintiff

leave to amend his complaint to add this alleged retaliation. Attorney Rakvic-Farr is directed to investigate and promptly report to the court if there are plans to transfer plaintiff in the next few months.

ORDER

IT IS ORDERED that:

1) Attorney Rakvic-Farr is directed to provide the court with a log of plaintiff's Assure Prism readings as detailed above on or before Wednesday April 17, 2019, or provide a written status report as to when it will be provided. Within seven days of receipt, the court will hold an evidentiary hearing by video conference on plaintiff's motion for a preliminary injunction.

2) Going forward, plaintiff is again directed to maintain a careful, written log of his blood sugar, noting the date, time, and blood sugar reading from his blood glucose meter each time he checks his sugar. He should also provide this updated log to the court and opposing counsel before the evidentiary hearing.

3) Attorney Rakvic-Farr is directed to report promptly to the court any plans to transfer plaintiff away from CCI in the next few months.

4) The clerk's office is directed to schedule a preliminary pretrial conference with Magistrate Judge Crocker in the regular course.

Entered this 12th day of April, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge